**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | **CRIMINAL NO.  22-218** |
| | ) | |
| v. | ) | |
| **CHRISTIAN GRAHAM,** | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.**    **Introduction**

Defendant Christian Graham ("Graham") filed a motion (ECF No. 93) seeking to suppress evidence recovered during a traffic stop on January 26, 2022.  The government filed a response in opposition to the motion (ECF No. 98).

On August 20, 2024, the court held an evidentiary hearing.  (Transcript, ECF No. 110). Pennsylvania state police corporal Randy Orlic ("Orlic") and trooper Philip Treadway ("Treadway"), a drug recognition expert, testified.[1]  Government exhibits 1 (Graham's certified driver history); 2 (a dashcam video of the automobile stop); and 5 (a search warrant for the car and inventory) were admitted into evidence.  Defense exhibits A through G were admitted.  The parties were permitted to file simultaneous post-hearing proposed findings of fact and conclusions of law.  (ECF Nos. 113, 114).  The motion is ripe for disposition.

---

[1] The court considered Graham's credibility challenges, but determined that Orlic and Treadway were credible in their respective testimonies.

## II.    Factual and Procedural Background

On August 30, 2022, a federal grand jury sitting in the Western District of Pennsylvania

returned a three-count indictment charging Graham with:

> (1) possession with intent to distribute 50 grams or more of methamphetamine and quantities of cocaine and fentanyl, in violation of 21 U.S.C. 841(a)(1), 841(b)(1)(B)(viii), and 841(b)(1)(C),

> (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1)(A)(i), and

> (3) possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. 922(g)(1).

## III.    Findings of Fact

### A.  Background

1.  Orlic has been employed by the Pennsylvania State Police for 18 years and participated in over 2,000 traffic stops.  Approximately 25 stops involved seizure of a firearm.  Tr. 9.

2.  On January 26, 2022, at approximately 6:40 p.m., Orlic was parked along Route 422 in Franklin Township, Pennsylvania, in a marked state police car.  Tr. 9.

3.  Orlic observed a dark-colored vehicle with dark tinted windows traveling east-bound on Route 422 at a high rate of speed.  Tr. 9.[2]

4.  Orlic began following the vehicle and ran the registration plate through the CLEAN system. The results showed that the vehicle was registered to two people, Graham and his mother, and that Graham's license was suspended.  Tr. 10.

5.  Orlic observed a photo of Graham from the CLEAN system.  Tr. 11.

---

[2] Graham was not charged with a speeding violation because Orlic could not state the speed at which Graham was driving.  Tr. 65.

6.  Orlic could not see clearly who was driving the vehicle, although it appeared to be a silhouette of a man's head.  Tr. 10.

7.  Orlic activated his lights to initiate a traffic stop based on the suspended license.  Tr. 10.

8.  Orlic's vehicle was equipped with a dashcam video, which began recording about 30-45 seconds before Orlic activated his lights.  Tr. 12.

9.  The dashcam video did not record Orlic's first observation of the vehicle or Orlic's request to run the registration.

### B.  The Initial Encounter

10. Graham pulled the vehicle over on the side of Route 422, which is a heavily travelled road with a narrow shoulder.  Dashcam.

11. Orlic pulled his police car behind the vehicle, exited the police car, approached Graham's vehicle, and confirmed the identity of the driver as Graham based on the CLEAN system photo.  Tr. 14.

12. Orlic instructed Graham to pull his vehicle into a nearby parking lot.  Graham did so.  Orlic again stopped his police car behind Graham's vehicle.  Dashcam.

13. Orlic called dispatch to get a certified record of Graham's driving history and to check for local arrest warrants.  There were no local warrants.  Tr. 15, 19.

14. At this point, no other officers were on scene.  Tr. 15.

### C.  The Approach to the Passenger Window

15. Orlic approached the front passenger window of Graham's vehicle, which was rolled down.  Orlic shined his flashlight in the vehicle.  Tr. 39-40.  Graham was the sole occupant of the vehicle.

16. Orlic immediately smelled a strong odor of marijuana and observed that Graham's eyes were glassy. Orlic did not alert Graham to these observations. Tr. 16-17.

17. Graham told Orlic that he was driving from Corry, Pennsylvania, where his girlfriend lived, to his home in Clearfield, Pennsylvania. Tr. 18.

18. Orlic regarded this response as deceptive and suspicious because Franklin Township is not on the route from Corry to Clearfield. Tr. 18.

19. The court takes judicial notice of the geographic facts that Franklin Township is south and west of Corry, Pennsylvania, while Clearfield, Pennsylvania, is southeast of Corry, Pennsylvania. Driving from Corry, Pennsylvania, to Clearfield, Pennsylvania, by going through Franklin Township, would increase the trip from 108 miles to 201 miles and add about an hour and a half to the trip. www.google.com/maps/dir/Clearfield,+PA/Corry. *See Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017) (taking judicial notice of Google maps showing the distances between cities).

20. Graham displayed nervous body language and was fidgeting.[3] He was on the phone with his mother. Tr. 17.

21. Orlic explained to Graham that he was pulled over because of the suspended license and asked Graham for his license, registration and insurance. Graham's responses were normal and he did not appear to be upset. Tr. 18.

22. Orlic asked Graham whether he had any guns in the vehicle and Graham's responses were different; i.e., he seemed "a little bit upset or angry" and wanted to move on from that question. Orlic believed Graham's answer about weapons was deceptive. Tr. 18-19.

---

[3] These observations were not included in the report about the incident, but Orlic remembered them because this incident was "probably one of the bigger that [Orlic] had where [he] seized illegal firearms and drugs." Tr. 69.

23. Orlic, based on his interaction with Graham, including Graham's nervousness, the smell of burnt and leaf marijuana, and Graham's fidgeting inside the vehicle, called for a backup officer.  Tr. 16.

24. Orlic returned to his police car to wait for backup to arrive.

### D.  The Third Encounter

25. Orlic had specialized training in conducting field sobriety tests and had performed over 200 of them.  Tr. 20.  Based on his observations at the passenger window, Orlic determined to perform a field sobriety test on Graham.  Tr. 19-20.

26. Treadway and trooper Dahlstrom arrived on scene.  Tr. 21.

27. Orlic went back to Graham's vehicle, told Graham he smelled marijuana, and instructed him to exit the vehicle.  Tr. 21.

28. Orlic patted Graham down for weapons for several reasons: (a) Graham's deceptive answers; (b) Orlic's intuition and experience dealing with people with concealed weapons; (c) Graham's nervous demeanor and fidgeting in the vehicle; and (d) Graham's reaching back into the vehicle to get his cell phone and Orlic not being able to see whether Graham grabbed a weapon.  Tr. 22.

29. Upon patting Graham down, Orlic felt a bag in the left front pants pocket.  Based on his experience feeling marijuana over 100 times, Orlic identified that the bag contained marijuana because he could feel the marijuana balls.  Tr. 22-23.

30. Orlic asked Graham if it was marijuana and Graham verbally confirmed it.  Orlic removed the bags from Graham's pocket and put them on the police car.  The amount appeared to exceed personal use.  Tr. 24-25, 50; Dashcam.

31. After removing the marijuana from Graham's pocket and while Graham was still standing by the police car, Orlic performed field sobriety testing on Graham.  When Orlic was done, he introduced Treadway to Graham as a drug recognition expert.  Treadway performed additional tests.

32.  At approximately 19:00 minutes on the dashcam, Treadway directed Graham to wait for just a second in front of Orlic's police car.

33. Orlic and Treadway conferred and determined that Graham failed the field sobriety testing in several respects and was under the influence of marijuana.  Tr. 24.  Treadway commented that Graham likely was guilty of a felony based upon the weight of marijuana recovered from his pocket.  Dashcam.

34. From 19:50 to 21:14 on the dashcam video, while Graham remained standing in front of the police car, the officers asked Graham a series of questions about whether there was more marijuana in the car, where he bought it, how long it would take him to smoke the amount in the baggies, why he was carrying enough marijuana with him to smoke for many weeks, etc.

35. At 21:14 on the dashcam video, the officers sought Graham's consent to search the vehicle. He refused.  Tr. 80.

36. At 23:04 on the dashcam video, Orlic informed Graham he was being detained for suspicion of driving under the influence of marijuana and for intent to distribute marijuana based on the quantity of marijuana recovered from Graham's pocket.  Tr. 71.

37. At approximately 25:00 on the dashcam video, Graham was handcuffed. Treadway transported Graham to the state police Butler County barracks to perform a thorough drug influence evaluation. Tr. 25-26, 75.

38. Per protocol, Graham would have been patted down for weapons prior to the transport. Tr. 26.

39. Following the 45-minute drug influence evaluation, Treadway determined that Graham could not safely operate a vehicle because he was impaired by marijuana. Tr. 79. Treadway notified Orlic about his determination prior to Orlic obtaining the search warrant. Tr. 79-80.

### E.  Search of the vehicle

40. Orlic determined to search the vehicle after detecting the strong odor of marijuana upon his initial approach to the passenger window. Tr. 25.

41. The odor of burnt and leafy marijuana continued to emanate from the vehicle after Graham was removed from it. Tr. 43, 78.

42. Graham's mother, who was talking on the phone with Graham during much of the encounter, volunteered to come and drive the vehicle away. The officers refused because they believed they had probable cause to search the vehicle for drugs. Tr. 25, 71-72.

43. After Graham was taken into custody, the officers arranged for the vehicle to be towed to their barracks. Tr. 26.

44. Orlic prepared an affidavit to obtain a search warrant for the vehicle. Tr. 27.

45. The officers sought a warrant to search the vehicle for other drugs and firearms based on their training and experience that persons with distribution quantities of marijuana may possess other drugs and firearms. Tr. 89-90.

46. A state magisterial district judge issued a search warrant at approximately 8:00 p.m. on

    January 26, 2022.  Ex. 5.

47. Orlic and Treadway conducted the search and found drugs, guns and ammunition.  Tr. 81.



## IV.    Conclusions of Law

In Graham's post-hearing submission, Graham contends that: (1) the initial stop of the automobile which he was driving was not supported by reasonable suspicion; (2) when Orlic initially leaned in the passenger window, that conduct constituted a warrantless search that was not supported by probable cause; (3) the pat-down of Graham was not supported by reasonable suspicion and the search of his pocket exceeded the scope of a *Terry* frisk; and (4)  the subsequent impoundment and search of the car was not supported by probable cause (ECF No. 114).  Graham also argues that there was a custodial interrogation about the marijuana, without a *Miranda* warning, which violated his Fifth Amendment rights.[4]  The court will address each of these contentions.[5]

A.  General Principles of law

1. The Fourth Amendment protects the public from "unreasonable searches and seizures."

   U.S. Const. amend. IV.

2. The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal

---

[4] The government contends that the motion to suppress should be denied in its entirety, but did not specifically respond to the argument that Graham's statements to the officers should be suppressed.

[5] Graham does not argue that the traffic stop was unduly extended beyond the "*Rodriguez* moment."  *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (officer must demonstrate reasonable suspicion to prolong stop beyond ordinary traffic stop).  Any such argument would be without merit because Orlic had probable cause to search the vehicle for drugs upon smelling a strong odor of marijuana immediately upon his initial approach to the passenger window.  *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) ("the smell of marijuana alone ... may establish not merely reasonable suspicion, but probable cause.").

case to be a witness against himself." U.S. Const. amend. V.

3. The burden of proof is initially on the defendant who seeks to suppress evidence. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). After the defendant establishes a basis for his motion (for example, by asserting that it occurred without a warrant), the burden shifts to the government. *Id.*

4. Warrantless searches and seizures are presumptively unreasonable unless an exception applies. *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018). One such exception is that a police officer may conduct a brief, investigatory stop (i.e., a "*Terry* stop") when the officer has a reasonable, articulable suspicion that criminal activity is afoot. *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

B. Reasonable suspicion – initial traffic stop

5. The reasonable suspicion standard applies to routine traffic stops. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006).

6. The government has the initial burden to prove by a preponderance of the evidence that a traffic stop is based on reasonable suspicion. *Wardlow*, 528 U.S. at 123; *United States v. Giles*, No. 1:07-CR-0192-01, 2008 WL 282369, at *7 (M.D. Pa. Jan. 31, 2008).

7. Courts "accord deference to an officer's judgment of whether criminal activity is taking place with an understanding that 'whether an officer has reasonable suspicion to warrant a stop ... is often an imprecise judgment.'" *Id.* (citation omitted). Courts must "afford significant deference to a law enforcement officer's determination of reasonable suspicion." *United States v. Torres*, 961 F.3d 618, 623 (3d Cir. 2020).

8. Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the

detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

9.   Reasonable suspicion can be based on an officer's reasonable, but incorrect, observations. *Delfin-Colina,* 464 F.3d at 398 ("an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place.").

10.  Reasonable suspicion "is a less demanding standard than probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

11.  In *Ramos*, officers detected the odor of marijuana coming from one of two vehicles.  The court held the officers had reasonable suspicion to investigate either or both vehicles further and were permitted to stop the defendants' car.  *Ramos*, 443 F.3d at 309.

12.  In *Kansas v. Glover*, 589 U.S. 376 (2020), the question was "whether a police officer violates the Fourth Amendment by initiating an investigative traffic stop after running a vehicle's license plate and learning that the registered owner has a revoked driver's license." *Id.* at 378.  The Supreme Court majority held "that when the officer lacks information negating an inference that the owner is the driver of the vehicle, the stop is reasonable." *Id.*

13.   The same reasoning in *Ramos* and *Glover* applies here.  Orlic had information that one of the two registered owners had a suspended license.  Orlic lacked information negating an inference that Graham was driving the vehicle (in fact, that inference turned out to be correct).  *Glover*, 589 U.S. at 378.

14. Defendant asserts two distinctions made in the concurring opinion in *Glover*: (1) the driver's license was revoked and not merely suspended; and (2) "when the officer learns a car has two or more registered owners, the balance of circumstances may tip away from reasonable suspicion that the one with the revoked license is driving." *Id.* at 389 (Kagan, J., concurring).

15. Graham's reliance on the concurrence in *Glover* is misplaced. Courts within the Third Circuit in subsequent decisions did not adopt the reasoning in the concurrence. Information that an owner of a vehicle has a suspended license continues to provide reasonable suspicion for a traffic stop. *United States v. Sepulveda*, No. CR 20-023, 2023 WL 4139023, at *2 (E.D. Pa. June 22, 2023); *United States v. Williams*, No. CR 21-408, 2022 WL 5169817, at *5 (W.D. Pa. Oct. 5, 2022).

16. In *United States v. Campbell*, No. CR 18-354, 2019 WL 979163 (D.N.J. Feb. 28, 2019), aff'd sub nom. *United States v. Yusuf*, 993 F.3d 167, 182 n.12 (3d Cir. 2021), the court rejected the same argument being made by Graham:

> Defendant casts doubt on whether Officer Manfredi could have actually identified the registrant as the driver of the Range Rover through the driver-side mirror and window at night. But that is a distinction without a difference. Aware that the registrant of the vehicle had a suspended license, Officer Manfredi had reasonable suspicion to initiate an investigatory stop and investigate whether the driver had a valid driver's license, particularly where he also had no reason to believe that the registrant was not the driver of the vehicle.

*Id.* at *4. The court explained that the officer need not unequivocally know that a violation had taken place, "but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place." *Id.* (citations omitted).

17. In *Sanchez v. United States*, 860 F. App'x 253, 254 (3d Cir. 2021), the court stated: "Reasonably suspecting a driver lacks a license is enough, and officers may reach that

suspicion by relying on probabilities combined with database information and commonsense judgments." *Id.* at 254 (citations and internal punctuation omitted).

18. The court concludes that the government met its burden by showing that because Orlic had information that one of the registered owners had a suspended license, he had reasonable suspicion to conduct the initial traffic stop of Graham's vehicle.


C.   Encounter at passenger window

19. Graham characterizes the initial encounter with Orlic at the passenger window as a warrantless search lacking probable cause.  It was not; instead, the encounter at the window was part of an ordinary traffic stop.

20. In *Rodriguez v. United States*, 575 U.S. 348 (2015), the Supreme Court explained that officers are permitted to engage in activities related to the purpose of the traffic stop and related safety concerns, including checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355; *accord United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (quoting *Rodriguez*).  "[S]ome questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop." *Garner*, 961 F.3d at 271.

21. An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop" absent reasonable suspicion. *Rodriguez*, 575 U.S. at 355.  In other words, an officer must demonstrate reasonable suspicion if the encounter exceeds the scope of a traffic stop or extends beyond the "*Rodriguez* moment."

22. It is well-established that Orlic was permitted to shine his flashlight into the vehicle. *Sanchez v. United States*, 860 F. App'x 253, 255 n. 4 (3d Cir. 2021) (citing *Texas v. Brown*, 460 U.S. 730, 739–40 (1983) ("shining a light to illuminate a car's interior is not a Fourth Amendment search")).

23. The initial encounter at the passenger window between Orlic and Graham was well within the scope of a traffic stop. Orlic was permitted to approach the vehicle, confirm the driver's identity, ask the driver (Graham) for his license and registration and determine whether Graham was driving with a suspended license. Orlic was permitted to ask questions about Graham's travel plans.

24. When Orlic lawfully approached the vehicle, he immediately smelled marijuana and observed Graham's bloodshot eyes. Those observations provided reasonable suspicion to extend the encounter to determine whether Graham was driving under the influence. *United States v. Green*, 897 F.3d 173, 186 (3d Cir. 2018). Indeed, Graham does not argue that the encounter exceeded the "*Rodriguez* moment." *See* discussion *infra* at 8 n.5.

25. Graham's constitutional rights were not violated during the initial encounter at the passenger window.

  D. <u>*Terry* Frisk</u>

26. A police officer who makes a lawful traffic stop may order the occupants to exit the vehicle and conduct a pat down of any occupant of the vehicle, even where there is no suspicion of criminal activity. The government's 'legitimate and weighty' interest in officer safety outweighs the 'de minimis' additional intrusion of requiring a driver,

already lawfully stopped, to exit the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1977); *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). The officer may conduct a frisk of the occupants if the officer has a reasonable suspicion that the person subjected to the frisk is armed and dangerous. *Id.*

27. In this case, officers had a reasonable basis to direct Graham to exit the vehicle because they intended to administer impaired driver tests based on the odor of marijuana and Graham's bloodshot eyes.

28. In this case, officers had a reasonable suspicion that Graham was armed based on the odor of burnt and fresh marijuana (which indicated to officers that Graham may have a weapon to support drug dealing activity), Graham's fidgeting demeanor, and his suspicious responses to questions about his travel plans and whether there were guns in the car. In addition, Graham reached back into the vehicle to get his cell phone and officers could not determine whether he had grabbed a weapon.

29. The court concludes that officers had reasonable suspicion to conduct a *Terry* frisk for weapons.

E. Plain feel doctrine

30. The Supreme Court has endorsed the "plain feel" doctrine by permitting officers to seize contraband they find while properly frisking for weapons. *See Minnesota v. Dickerson*, 508 U.S. 366, 375–76 (1993) ("If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless

seizure would be justified by the same practical considerations that inhere in the plain-view context.").

31. The Court of Appeals for the Third Circuit defined the bounds of the "plain feel" doctrine: "The proper question under *Dickerson*, therefore, is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required to acquire that knowledge, but rather **what the officer believes the object is by the time he concludes that it is not a weapon**. That is, a *Terry* search cannot purposely be used to discover contraband, but it is permissible that contraband be confiscated if spontaneously discovered during a properly executed *Terry* search. Moreover, when determining whether the scope of a particular *Terry* search was proper, the areas of focus should be whether the officer had probable cause to believe an object was contraband before he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk." *United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007) (emphasis added).  The court explained:

> [The officer] is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon. If, before that point, the officer develops probable cause to believe, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search. If, indeed, he discovers contraband, the officer may seize it, and it will be admissible against the suspect.
>
> *Id.*

32. Here, patting Graham's pants pockets was within the scope of a routine frisk for weapons.  During the pat down, Orlic, based upon his training and experience, immediately identified the substance in Graham's pocket as marijuana.  Tr. 22-23.

33. The seizure of the bags of marijuana discovered in Graham's pocket during the *Terry*

15

frisk did not violate Graham's rights.


F.   Vehicle search

34. The odor of burnt and green marijuana emanated from the vehicle even after Graham was removed from it.  Tr. 78.

35. "It is well settled that the smell of marijuana alone ... may establish not merely reasonable suspicion, but probable cause." *Ramos*, 443 F.3d at 308.

36.   The officers did not search the car onsite.  Instead, after determining that Graham was impaired and could not drive the vehicle, they arranged to have the vehicle towed to the barracks and applied for a search warrant.

37. The search of the vehicle was conducted pursuant to a lawfully issued search warrant.

38. District courts "conduct only a deferential review of the initial probable cause determination made by the magistrate." *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Illinois v. Gates,* 462 U.S. 213, 236 (1983)). "The role of a reviewing court is not to decide probable cause *de novo,* but to determine whether the magistrate had a substantial basis for concluding that probable cause existed." *Id.* "[O]ur role is not to make our own assessment as to whether probable cause existed. Rather, we are constrained to determine only whether the affidavit provides a sufficient basis for the decision the magistrate judge actually made." *Id.* (quoting *United States v. Jones,* 994 F.2d 1051, 1057 (3d Cir.1993)). "If a substantial basis exists to support the magistrate's probable cause finding, we must uphold that finding even if a different magistrate judge might have found the affidavit insufficient to support a warrant." *Id.* "Although we do not merely rubber stamp a magistrate's conclusions, we must heed the Supreme Court's

direction that doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.*

39. In this case, the troopers presented an affidavit to a neutral magistrate judge and obtained a warrant. The affidavit contained the following averments, among others:

    a. [Affiant] detected a strong odor of marijuana coming from inside the passenger compartment of the vehicle.
    b. Upon conducting a *Terry* frisk for weapons on GRAHAM, [Affiant] noticed a bulge in his left pants pocket. He indicated he was in possession of marijuana in his pocket . . . .
    c. GRAHAM was also in possession of a large sum of US Currency in his wallet.
    d. The marijuana in his pants pocket was preliminary weighed at PSP Butler. The weight was determined to be 48 Grams of processed marijuana.

Ex. 5.

40. These averments provided a sufficient basis for the magistrate judge to find probable cause to search the vehicle. There was a fair probability—i.e., probable cause to support a search warrant—that additional contraband or evidence of a crime would be found in the vehicle. Guns are often used in the trafficking of drugs, so it was permissible for the warrant to include guns within the list of items to be searched for and seized. *See United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011) (recognizing that "firearms are the tools of the trade of those involved in illegal drug activity.").

41. The items recovered from the search of the vehicle will not be suppressed.

    G. Custodial interrogation

42. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the inherent pressure of custodial interrogation in an unfamiliar, police-dominated atmosphere. *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (citing *Miranda*, 384 U.S. at 456-57)).

43. To counteract that pressure, "police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." *Shatzer*, 559 U.S. at 103 (citing *Miranda*, 384 U.S. at 444)).

44. The court must first determine when Graham was taken into "custody" that would trigger a duty to provide *Miranda* warnings.

45. To determine whether a suspect is in custody, courts first set forth "the circumstances surrounding the investigation," and then "ask, as an objective matter, whether 'a reasonable person [would] have felt that he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019). The court must also "ask[ ] the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* (citation omitted).

46. "[T]he roadside questioning of a motorist who was pulled over in a routine traffic stop did not constitute custodial interrogation." *Howes v. Fields*, 565 U.S. 499, 509-10 (2012) (citing *Berkemer v. McCarty*, 468 U.S. 420, 423, 441-42 (1984)); *accord United States v. Gonzalez Segovia*, No. 5:18-CR-00558, 2019 WL 3530910, at *13 (E.D. Pa. Aug. 2, 2019), *aff'd,* 858 F. App'x 589 (3d Cir. 2021).

47. Questions during a *Terry* frisk do not require *Miranda* warnings. *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("Thus, the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody."); *accord United States v. Ramirez-Mendoza*, No. 4:20-CR-00107, 2021 WL 4502266, at *9 (M.D. Pa. Oct. 1, 2021) ("In general, when a suspect is detained pursuant to a *Terry* stop, an

officer may question her without providing *Miranda* warnings. This rule also extends to routine traffic stops.").

48. The court faced a similar factual situation in *United States v. Hargett*, 58 F. App'x 942 (3d Cir. 2003). After a traffic stop, the officer removed the occupants from the car and advised the defendant he was going to pat him down for weapons. During the patdown, the officer felt a bulge in the pants pocket and the defendant told the officer it was Xanax, for which the defendant had no prescription. The district court determined no *Miranda* warning was required and both the drugs and the statements would be admissible. The court of appeals affirmed, commenting that the district court's legal analysis was not "flawed in any way." *Id.* at 945.

49. Graham's statements to Orlic during the *Terry* frisk, confirming that the bags in his pocket contained marijuana, will not be suppressed.

50. Approximately 10 minutes later, after the sobriety testing was completed, the officers determined that Graham was impaired and would be detained. Tr. 24, 78-79. At that point, Graham was objectively not free to leave, even though officers had not yet placed him in handcuffs. In addition, Graham was not free to leave because the officers recovered a distribution quantity of marijuana from his pocket. Tr. 71.[6]

51. After making the decision to detain Graham, the officers asked Graham several additional questions about the marijuana. Dashcam at 19:50-21:11.

52. Those questions constituted a custodial interrogation, for which the officers did not provide a *Miranda* warning. *United States v. Hvizdzak*, No. CR 21-30E, 2024 WL 4150099, at *6 (W.D. Pa. Sept. 11, 2024) (listing factors to be considered). Of particular

---

[6] To be clear, Orlic knew based on his training and experience that Graham had marijuana in his pocket, but he did not know the quantity until he removed the bags from Graham's pocket. Tr. 22-25; Dashcam.

relevance in this case, multiple armed officers were present, the encounter had progressed beyond the initial traffic stop and *Terry* frisk, and the officers believed Graham was guilty of at least two offenses – driving while impaired and possession of a distribution quantity of marijuana.  Graham was not free to terminate the encounter, get back in his car, and drive away.  *See United States v. Garcia*, No. CR 21-105, 2023 WL 4950573, at *16 (W.D. Pa. Aug. 3, 2023) (*Miranda* warnings not required for initial traffic stop or subsequent consent search of vehicle, but were required when officers found an aftermarket compartment for hiding drugs).

53. A defendant satisfies his initial burden to suppress statements "if he alleges that he was subjected to custodial questioning without the benefit of *Miranda* warnings, at which point the government must prove by a preponderance of the evidence that there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or ... [the defendant] ... was properly *Mirandized* and waived his rights." (quoting *United States v. Valenta*, Crim. No. 15-161, 2017 WL 2131375, at *4 (W.D. Pa. May 17, 2017) (internal quotation marks and citation omitted).

54. As noted above, the government did not respond to this argument and, therefore, did not meet its burden to demonstrate an exception to *Miranda*.

55. Graham's responses to the questions posed at Dashcam 19:50 to 21:11 will be suppressed.  The court observes that Graham is not charged in this case with any crimes related to the marijuana.

**V.**      **Conclusion**

After careful consideration of the record and relevant legal authorities, the court concludes that the motion to suppress evidence filed by Graham (ECF No. 93) will be GRANTED IN PART AND DENIED IN PART.  The motion will be granted with respect to Graham's responses to the questions posed at Dashcam 19:50 to 21:11, and denied in all other respects.


The court will set a telephone status conference for November 6, 2024 at 11:30 a.m., to discuss the next step for this case, because the speedy trial clock is running.

An appropriate order will be entered.


BY THE COURT:

November 5, 2024

/s/ *Joy Flowers Conti*
Joy Flowers Conti
Senior United States District Judge